UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BONNIE J. WALKER,

**Plaintiff,**

    v.

Case No. 1:19-cv-00352-TPK

**COMMISSIONER OF SOCIAL SECURITY,**

OPINION AND ORDER

**Defendant**.

## OPINION AND ORDER

    Plaintiff Bonnie J. Walker filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on January 16, 2019, denied Ms. Walker's application for social security disability benefits. Ms. Walker has now moved for judgment on the pleadings (Doc. 7) and the Commissioner has filed a similar motion (Doc. 9). For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and **REMAND** this case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## I.  BACKGROUND

    Plaintiff's application was filed on January 25, 2016. She alleged that she became disabled on June 25, 2015, due to back and ankle disorders. She was 57 years old at the time her application was filed.

    After initial administrative denials of her claim, Plaintiff appeared and testified at an administrative hearing held by video on May 10, 2018. A vocational expert, Lynette Paulsen, also testified at the hearing.

    The Administrative Law Judge issued an unfavorable decision on May 25, 2018. He first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021, and that she had not worked since her alleged onset date. Next, the ALJ concluded that Plaintiff suffered from severe impairments including degenerative disease of the cervical and lumbar spine, status post right ankle fracture, and tenosynovitis and ligament tear, status post surgery in 2017. The ALJ addressed the question of whether Plaintiff had severe mental impairments as well (the record contains diagnoses of PTSD, anxiety, and depression) but determined that those impairments were not severe. Moving forward with the sequential evaluation process, the ALJ then found that none of Plaintiff's impairments met the criteria for

disability under various sections of the Listing of Impairments. Next, the ALJ determined that these impairments limited Plaintiff to the performance of a reduced range of sedentary work. She could not climb ladders, ropes, or scaffolds, could not balance, could climb ramps and stairs occasionally, could occasionally stoop, kneel, crouch, and crawl, and had to avoid exposure to vibration, unprotected heights, and moving machinery.

The ALJ determined that with these restrictions, Plaintiff could perform her past relevant work as a secretary/office clerk. That conclusion was supported by the testimony of the vocational expert who said that someone with Plaintiff's residual functional capacity could do that work as it is generally performed in the economy. Based on this evidence, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment on the pleadings, asserts several claims of error. She argues that the ALJ did not properly evaluate the opinion of Dr. Beaupin, a treating source; failed to re-contact Dr. Beaupin for clarification; improperly gave significant weight to the opinions of a non-examining source and a consultative evaluation; failed to evaluate the opinion of a neuropsychologist, Dr. Englert; and based the residual functional capacity finding on his (the ALJ's) own lay opinion. As a result, Plaintiff asserts that the ALJ's decision is not based on substantial evidence.

## II.  THE KEY EVIDENCE

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing.

Plaintiff said her current living arrangement was in a single-family home where she resided with her husband, daughter, and four-year-old granddaughter. Plaintiff had graduated from high school and had attended college, but did not get a degree. She had most recently worked as a secretary for an industrial firm, doing typical secretarial tasks. She stopped working in 2015 after being injured in an automobile accident. According to Plaintiff, the accident affected her memory and also injured her ankle to the point where she was on crutches. She did suffer from some back pain prior to the accident but not to the point where she could not work.

Responding to a question concerning her ability to return to work, Plaintiff said she could not do so due to being unable to sit, stand, or walk for any length of time. Her ankle still swelled and was painful and she needed injections for pain in her neck and shoulder. She said she was also a candidate for back surgery and for surgery to remove scar tissue in her ankle. Her medication also affected her ability to concentrate and her memory problems impacted her ability to work as well. She was not undergoing treatment for memory issues, however, and had to discontinue mental health treatment due to insurance issues. In the past, Plaintiff had also had bad migraine headaches, but medication had improved that problem.

When asked about daily activities, Plaintiff said she did simple cooking and a little cleaning, but not mopping or vacuuming. Her husband and daughter helped with housework.

She had spent her days with her mother watching television, or doing some shopping.  She had not driven a car for some time and would not do so after the accident.  She was able to do crossword puzzles and play games on the computer, but that activity strained her eyes and made her dizzy.  Her social activities were mainly limited to going to church and visiting her sister.

In response to questions from her counsel, Plaintiff said that she could sit for only fifteen to twenty minutes at a time and could stand and walk for the same duration.  She could climb stairs but it was difficult.  She was able to lift up to ten pounds but could do no overhead reaching.  Sometimes she reacted to stress by getting a migraine.

Ms. Paulsen, the vocational expert, was the next witness.  She classified Plaintiff's past work as a secretary as sedentary and skilled, and also said that when Plaintiff had worked as an office clerk that job was sedentary as Plaintiff performed it and semi-skilled.  When asked if someone who was limited to sedentary work with various additional restrictions could perform those jobs, she said that such a person could do so.  A limitation to simple, routine tasks would eliminate both jobs, however.  Lastly, she said that employers would not tolerate someone being off task for more than ten to twelve percent of the time in these jobs, or being absent for more than one day per month.

The pertinent medical records are those relating to the opinions expressed by treating, consultative, and non-examining sources.  Because several of Plaintiff's claims of error relate to the opinion expressed by her pain management physician, Dr. Beaupin, the Court will begin it summary of the medical evidence with a review of his records.

Dr. Beaupin's treatment notes show that Plaintiff was involved in a motor vehicle accident on June 25, 2015, when her side of the car she was riding in was struck by another car that had run a stop sign.  She briefly lost consciousness and was taken to the hospital with head, neck, back, and leg pain. Almost a year later, she was still having pain in her right ankle as well as dizziness and neck and back pain.  Standing and sitting exacerbated her pain and medications and physical therapy reduced it.  On examination, she showed significant reduction in the range of motion of her cervical and lumbar spines and muscle spasms and trigger points in the paraspinal area.  Imaging showed central disc herniations at L4-5 and L5-S1 in the lumbar spine and multiple disc herniations in the cervical spine with impingement.  Dr. Beaupin had recommended trigger point injections as well as physical therapy and a continuation of chiropractic treatment for her lower back. He saw no need for narcotic pain medication.  In the "function" section of his notes, Dr. Beaupin variously reported that Plaintiff could sit for 10-20 minutes or for up to 45 minutes, stand for 10-20 minutes or up to 30 minutes, walk for 5-10 minutes or up to 40-60 minutes, and lift 1-5 pounds or up to 10-20 pounds, and he also indicated that she was "disabled."  Overall, he treated her on seventeen different occasions over a two-year period.

On May 13, 2018, Dr. Beaupin completed a physical capacities evaluation form.  On it, he stated that Plaintiff's diagnoses included cervical disc herniation, lumbar disc herniation,

lumbar radiculitis, right ankle injury, and benign paroxysmal vertigo and that her prognosis was poor.  Clinical findings included a depressed affect and limitations of the range of motion of her spine with painful muscle spasms.  Dr. Beaupin believed that Plaintiff's pain and other symptoms constantly interfered with the type of attention and concentration needed to do even simple work, that she could not tolerate work stress (although physically she could do sedentary work), that she could sit for 45 minutes at a time, stand 10-20 minutes at a time, do both for about two hours in a workday, had to get up and walk every fifteen minutes, needed to be able to change positions at will, had to take three to four unscheduled work breaks per day, had to use a cane when walking, could rarely lift less than ten pounds, could rarely look down, turn her head, look up, or turn her head in a static position, had severe limitations on the use of her hands, fingers, and arms, was likely to miss four days of work per month, and was not capable of sustaining full-time employment. (Tr. 1024-28).

In contrast, the record contains two opinions suggesting that Plaintiff was capable of working at the sedentary level or beyond.  The first was rendered by Dr. Figueroa, who performed a consultative examination on March 16, 2016.  At that examination, Plaintiff reported constant sharp pain in her neck, supported by x-rays showing multi-level degenerative disc changes and foraminal narrowing with central canal stenosis, as well as constant sharp and stabbing back pain radiating down her right leg.  Plaintiff also had pain in her right ankle due to multiple fractures and ligament tears sustained in her automobile accident.  She reported doing no cooking, shopping, or child care, and doing cleaning and laundry once or twice per week.  Her gait was normal and she could heel and toe walk without difficulty.  Dr. Figueroa noted limitations in the range of motion of the cervical and lumbar spines and abnormal reflexes in the arms and knees.  Plaintiff's hand and finger dexterity were intact and her grip strength was normal.  It was Dr. Figueroa's opinion that Plaintiff had only moderate limitations for activities requiring repetitive bending, lifting, and carrying beyond an occasional ten pounds, and mild limitations for turning movements of the neck or prolonged pushing and pulling. (Tr. 376-80).

Dr. Bijpuria, the non-examining medical consultant, rendered his opinion on March 2, 2018.  He thought that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, could stand, walk, and sit for six hours in a workday, was limited in her ability to pull and push with her legs, could occasionally perform most postural activities of working, and had no other limitations.  He explained that the record did not show that Plaintiff had sought and received evaluation and treatment for persistent pain of the spine or that she received intensive pain management.   There is no specific indication that he reviewed Dr. Beaupin's records, and he clearly did not have the benefit of Dr. Beaupin's May, 2018 opinion statement. (Tr.  920-30).

Plaintiff also raises issues about the ALJ's determination that she did not suffer from any severe mental impairments.  The Court will briefly summarize the records relating to that issue as well.

Plaintiff did report some mental difficulties including short-term memory loss following the accident.  She was seen by Dr. Zali, a psychologist, for an evaluation on March 16, 2016.  Dr.

Zali reported Plaintiff's complaints that she was in constant pain and that it woke her up twice per night as well as her statements about memory loss. Plaintiff's affect was euthymic and she was properly oriented with intact attention and concentration. However, her memory skills were impaired. She was able to deal with both simple and complex tasks and instructions but would have moderate difficulty learning new tasks due to her memory problems. Neurocognitive testing was recommended. (Tr. 371-74).

Plaintiff was subsequently seen by a neuropsychologist, Dr. Englert, on two occasions in January of 2017. Her concerns at that time involved her cognition, mood, and functioning. Dr. Englert noted that Plaintiff had been treated for post-concussion syndrome in 2016 and there were some objective findings resulting from that treatment. Plaintiff reported word-finding difficulty and poor memory for day-to-day events as well as problems remembering things from her past and some issues with paying attention while reading. Dr. Englert noted that Plaintiff's affect was flat and her mood was somewhat depressed, she appeared fatigued, and she seemed to have some difficulty focusing. She scored in the borderline to low average range on a visuospatial memory test and in the impaired range on a brief test of attention. Overall, her test scores were slightly lower than expected. Dr. Englert's impressions included attention and concentration deficit, executive functioning deficit, mild memory disturbance, and adjustment disorder with mixed anxiety and depressed mood. Her attention deficit was characterized as "significant." Dr. Englert recommended that Plaintiff continue with weekly counseling and that she seek cognitive therapy to help her focus attention and learn strategies to cope with the changes she had experienced. (Tr. 381-87).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence

standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Dr. Beaupin's Opinion

Plaintiff's first two assertions of error center around the ALJ's evaluation of Dr. Beaupin's opinion.  Dr. Beaupin is clearly a treating source, so it is important to review in some detail the ALJ's rationale for affording that opinion less weight than the opinions of Dr. Bijpuria, who was a non-examining medical consultant, and Dr. Figueroa, the consultative examiner.

The ALJ mentioned specifically these limitations from Dr. Beaupin's opinion: that Plaintiff  "could only sit, stand, or walk for a total of two hours in an eight-hour workday, ... requires a cane for ambulation, ... can do less than occasional handling, must avoid all reaching, ... has pain so severe it constantly interferes with attention and concentration even for simple tasks, and would be absent from work more than four days a month due to her impairments or treatment."  (Tr. 19).  As noted above, that is not an exhaustive list of the limitations posited by Dr. Beaupin.  He characterized these as "extreme limitations ... not supported by the record as a whole" and said that they "seem grossly exaggerated compared to the subjective and objective reports in the orthopedic treatment notes (Exhibit 38F) and the consultative examination performed by Dr. Figueroa." *Id.*  The ALJ gave a few examples of such inconsistencies, including the fact that Plaintiff walked with a steady gait and without assistance and that her grip strength and hand and finger dexterity were normal.  By contrast, the ALJ gave "significant weight" to the opinions of Drs. Bijpuria and Figueroa, although the ALJ did not explain why he did so, and he also gave "the highest benefit of the doubt" to Plaintiff's pain complaints by limiting her to sedentary work even though both of those doctors appeared to conclude that she could do light work as well.

Plaintiff argues that the ALJ's basis for discounting Dr. Beaupin's opinion appears to be limited to one orthopedic treatment note and the observations made at the time of the consultative examination, both of which predated the extensive treatment provided by Dr. Beaupin, and that Dr. Beaupin's opinions were well-supported by his own treatment notes and objective findings.  Additionally, she argues that the ALJ did not explicitly apply all of the factors which are relevant to the evaluation of a treating source opinion and that he should have re-contacted Dr. Beaupin to obtain additional information if he perceived an inconsistency between the evidence of record and Dr. Beaupin's "extreme" opinions.  She accompanies this

argument by contending that there was no basis for preferring the other non-treating source opinions over that of Dr. Beaupin and that they were "stale" based on additional developments and did not have the benefit of the entire medical record. In response, the Commissioner contends Dr. Bijpuria's opinion was clearly not stale and was based on a relatively complete record, and that Dr. Figueroa's opinion constitutes substantial evidence because there was little or no deterioration in Plaintiff's condition after that opinion was rendered. Rather, according to the Commissioner, the records demonstrated substantial improvement in her condition and also showed that Plaintiff's activities of daily living were consistent with the ability to perform work at the sedentary level or above.

When this case was decided, the "treating physician" regulation found at 20 C.F.R. §404.1527 was still in effect (it has since been repealed). As this regulation has been interpreted,

> "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " [*Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir.2008)] at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). There are, of course, circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam) (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Nevertheless, even when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. See 20 C.F.R. § 404.1527(c)(2)(I), (2)(ii), (3)–(6). "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Burgess*, 537 F.3d at 129 (alteration in original) (quoting *Halloran*, 362 F.3d at 33). The failure to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 129–30 [citation omitted]. The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Id*. at 131.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015).

The Court finds the ALJ's consideration of the treating physician opinion to be insufficient under this standard. Importantly, the ALJ relied heavily upon the conflicting opinions of the non-treating and non-examining sources without providing any rationale for why he preferred those opinions to that of Dr. Beaupin. At the very least, if relying on such opinions, an ALJ should explain why he considered them to carry more weight than the conclusions of the treating source. Further, there were specific limitations found by Dr. Beaupin, including the need for a sit-stand option and limitations on overhead reaching and turning her head, which the ALJ did not acknowledge at all, nor did he provide any reasoning for rejecting them. Rather, he appeared to treat the variety of limitations expressed in Dr. Beaupin's report as a single entity and characterized all of them as "extreme" and inconsistent with other portions of the record, although he identified only a very few inconsistent treatment notes, and they did not contradict every portion of Dr. Beaupin's findings. In short, given the preference afforded to treating source opinions, the ALJ simply did not provide enough analysis to comply with the applicable law and did not articulate his reasons for rejecting significant portions of that opinion. This error requires a remand.

### B. Cognitive Impairment

Plaintiff next argues that the ALJ did not deal adequately with the neuropsychological assessment done by Dr. Englert. As noted above, Dr. Englert concluded that Plaintiff had a significant deficit in the area of attention and had milder, but still noticeable, deficits in memory and executive functioning. These problems were attributed to a cognitive functioning disorder as well as to Plaintiff's anxiety and depressive disorders. The Commissioner responds that after Dr. Englert evaluated Plaintiff, records demonstrated an improvement in her symptoms or that similar symptoms were being caused by medication.

In his analysis of severe impairments, the ALJ noted that the record included diagnoses of several mental impairments including PTSD, anxiety, and depression (but not a cognitive disorder). However, he concluded that these impairments caused no more than slight functional limitations and were therefore not severe. He commented only briefly on the neuropsychological examination done by Dr. Englert in the context of evaluating the "B" criteria for mental impairments, stating that the test results showed that her functioning, while reduced, was still in the low average range, and that she had some difficulty focusing but her score on the Working Memory Index was also low average. (Tr. 14-15). He did not include any cognitive limitations in his residual functional capacity finding, nor did he discuss any aspects of Dr. Englert's report in the section of the decision dealing with residual functional capacity.

Plaintiff is correct that, regardless of whether an impairment is severe or not, any functional deficits caused by that impairment must be included in the ALJ's residual functional capacity finding. As this Court has said, "it is well-established that an ALJ is required to consider functional limitations that arise from non-severe impairments." *Benman v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 252, 258 (W.D.N.Y. 2018). The Commissioner's argument, that a reasonable reading of the record supports the ALJ's conclusion that there were no such functional

limitations, is not borne out by the evidence. It is impossible to read Dr. Englert's report as stating that Plaintiff did not have cognitive limitations, which are especially important here given the fact that the ALJ found that Plaintiff's past relevant work was either skilled or semi-skilled in nature. Her attention deficit and difficulties with executive functioning would make the performance of such jobs seem especially problematic, but the ALJ did not - aside from asking the vocational expert if a limitation to simple tasks would preclude such employment - make an effort to determine if those difficulties were consistent with the past relevant work. The later records cited by the Commissioner show that Plaintiff continued to have a primary diagnosis of post-concussion syndrome, and all of those records state that Plaintiff was continuing to have symptoms of that disorder. The general comment that she had "[g]ood attention and concentration" cannot be read as a refutation of the results of Dr. Englert's comprehensive study, especially when that comment - heavily relied on by the Commissioner - appears to be a standard note appearing in all of the subsequent treatment records from Dent Headache and Neurology Center, and made by a non-physician. The ALJ did not consider that fact because he did not engage in any meaningful discussion of Dr. Englert's conclusions, and he clearly did not ascribe enough weight to the views of Dr. Englert on the issue of whether Plaintiff either had a severe cognitive disorder or had limitations arising from post-concussion syndrome that affected her ability to perform certain work activities. This is also an error requiring remand.

In light of the fact that the Court has found merit in Plaintiff's arguments about the treating source opinion and the existence of limitations arising from a cognitive impairment, there is no need to address Plaintiff's remaining claim. Therefore, the Court will order a sentence four remand.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** Plaintiff's motion (Doc. 7), **DENIES** the Commissioner's motion (Doc. 9), and **REMAND**S this case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

**/s/ Terence P. Kemp**
**United States Magistrate Judge**